# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

ROBERT RUSSELL,         )
          )
      Movant,      )
          )
vs.         )  3:13-cv-08007-LSC-JHE
         )  (3:11-cr-00011-LSC-JHE-4)
UNITED STATES OF AMERICA,  )
          )
      Respondent.  )

## MEMORANDUM OF OPINION

Robert Russell ("Russell" or "Movant") has moved pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his conviction and sentence.  (CV, doc. 1; CR, doc. 129).[1]  Upon due consideration, the remaining claims in Russell's § 2255 motion are due to be denied.

## I. Procedural History[2] and Background

On February 3, 2011, Russell was indicted on five counts of a nineteen count indictment.  Russell was indicted on two counts of mail fraud, 18 U.S.C. § 1341, one count of conspiracy to commit mail fraud, 18 U.S.C. § 1349, and two counts of aggravated identity theft, 18 U.S.C. § 1028A.  The indictment proceeded to trial,

---

[1] Unless otherwise designated "CR," all subsequent citations will be to document numbers as assigned by the Court's electronic filing system in the civil habeas case.

[2] *See generally*, *United States v. Robert Russell*, 3:11-cr-00011-LSC-JHE-4.

and, on September 8, 2011, a jury found Russell guilty on one count of mail fraud

and one count of conspiracy to commit mail fraud.  The government dismissed the

remaining charges when the jury was unable to reach a verdict as to them. At a

sentencing hearing on December 8, 2011, Russell was sentenced to 87 months

confinement on both counts to run concurrently.[3]  Judgment was entered on

December 9, 2011.

Russell directly appealed to the Eleventh Circuit Court of Appeals on

December 9, 2011.  On appeal, Russell argued the trial evidence was insufficient

because it did not demonstrate that he showed his alleged co-conspirators how to

fraudulently order drugs over the internet, that there was an agreement to carry out

a fraudulent scheme, that he intended online pharmacies to suffer losses, or that he

sent false or misleading information to pharmacies to obtain drugs.  *See United

States v. Russell*, 501 F. App'x 860 (11th Cir. 2012) (per curiam).  In reviewing the

evidence presented at trial, the Eleventh Circuit explained as follows:

> Count 13 of the indictment alleged that Alfred Shawn Johnson,
> Kristi Fraley, Marcus Oakley, Russell, and others conspired to commit
> mail fraud.  To begin, Oakley and Johnson testified about how they
> became involved through Russell in the scheme to defraud by ordering
> prescription drugs over the internet. Oakley described how he would
> provide Russell with his identification information and an old medical
> record, and they would order the pills and then split them.  Oakley
> also described his own operation, in which he ordered prescription

---

[3] On November 9, 2015, Russell filed an unopposed motion to reduce his sentence from
87 months to 71 months based on 18 U.S.C. § 3582 and USSG Amendment 782.  (CR, doc. 132).

drugs for third parties using altered medical records, and explained that he learned how to order prescription drugs online from Russell and that his operation was "similar to" Russell's operation.

The evidence further showed the fraudulent nature of Russell's scheme and the misrepresentations used to deceive the online pharmacies and obtain drugs. Oakley explained that he witnessed Russell ordering pills online using the names of third parties on multiple occasions, and he witnessed Russell using the identification of third parties to facilitate this activity. After the orders were placed, he and Russell would pose as the persons in whose name the pills were ordered. Oakley altered medical records and when asked if Russell did this, said that "we all done it." Although the pills were ordered in a particular person's name, Johnson and Oakley each sold some of the pills that they obtained, and Russell also sold some of the pills. In addition, the physical evidence presented--including pill bottles found in the truck and at the residence of Russell, and copies of driver's licenses of third parties and medical records of third parties found both in Johnson's and in Russell's residences--further supported the existence of their scheme to defraud. . . . .

The evidence also showed an agreement among Oakley, Russell, and Johnson to carry out the scheme to defraud, and Russell's knowing and willful participation in the scheme. Oakley and Johnson each initially worked directly with Russell to order prescription drugs over the internet. Oakley used Russell's computer and fax machine to place his order and the two ordered pills together several times. Even after Oakley began ordering pills over the internet on his own, he and Russell "still talked to each other," and Oakley said that if he "needed money I would go get it from Bobby [Russell], get my orders." Johnson said that in order to become involved in the scheme, he had to "buy my way in" and make his first few orders with either Oakley or Russell.

Moreover, the parties shared significant information in carrying out the scheme. Oakley and Russell shared websites where drugs could be ordered. Johnson and Russell shared medical records, some of which had been altered. Johnson allowed Russell to have access to

identification cards and driver's licenses that were at Johnson's residence. This sharing of information was further supposed by physical evidence, which included copies of Oakley's identification information that had been found in the search of Russell's residence; copies of Russell's identification information and medical records that had been found in the search of Johnson's residence; and similar paperwork for a third party, Brandon Gene Prestridge, that had been found in both Russell's and Johnson's residences.

The evidence also showed that Russell knowingly and willfully participated in the scheme. For example, Russell told Oakley he could get pills in Ken McDonald's name because he had copies of his driver's license and social security card. Physical evidence consisting of a pill bottle label with McDonald's name, copies of his identification, and his medical records, were found in the search of Russell's residence. Although other pills were ordered in Johnson's name, not in Russell's name, Russell took half of these pills as payment.

As for the substantive mail fraud count, the evidence showed that Russell and Johnson defrauded an online pharmacy in Ocala, Florida, by ordering drugs in Carla Pigg's name. Oakley testified that Carla Pigg gave him her driver's license, but he said that he did not order pills for Pigg. Rather, as we've detailed, the parties to the scheme significantly shared information. So, for instance, Oakley shared his customer identifications with Russell, and Oakley and Johnson also shared medical records. A cover sheet was found in Johnson's residence that contained Carla Pigg's email address and password. Johnson admitted that he wrote the cover sheet and that he would have used it to order drugs over the internet. Copies of Pigg's driver's license and medical records were also found in Johnson's residence. Johnson and Russell shared records and Johnson allowed Russell access to identification cards and copies of driver's licenses at his residence. In addition, a January 2009 search of the truck that Russell was driving yielded a pill bottle labeled in Carla Pigg's name for hydrocodone, which was from Sunshine Drugs in Ocala, Florida. Furthermore, Russell denied knowing Pigg and claimed he had never seen her identification information, adding support that the pill bottle

in her name was obtained fraudulently.  In considering this evidence together, a reasonable juror could infer and conclude that Russell and Johnson had defrauded an online pharmacy in Ocala, Florida, by ordering drugs in Pigg's name.

*Id.* at 862-64.  On December 12, 2012, the Eleventh Circuit affirmed Russell's convictions. *See id.*

On March 21, 2013, Russell filed this § 2255 motion.  (Doc. 1).  On March 27, 2013, the magistrate judge to whom this case was previously assigned entered a show cause order requiring the government to respond to claims 1, 2, and 4.  (Doc. 6).  On April 1, 2013, the Court entered a memorandum opinion and order dismissing claim 3, which alleged abuse of judicial discretion/excessive sentence, as procedurally defaulted.  (Docs. 7 & 8).

In response to the previously entered show cause order, on April 16, 2013, Respondents filed a motion to dismiss claims 1, 2, and 4 (Russell's remaining claims) without an evidentiary hearing.  (Doc. 9).  On April 25, 2013, the magistrate judge to whom this case was previously assigned entered an order informing Russell of his right to file affidavits and/or other documents in opposition to Respondent's motion.  (Doc. 10).  Russell filed a rebuttal to the government's motion to dismiss.  (Docs. 12 & 14).

**II. Claims**

Russell's remaining claims raise three general issues: (1) seven separate claims for ineffective assistance of counsel; (2) prosecutorial misconduct; and (3) actual innocence.

## III. Analysis

Respondent argues all of Russell's remaining claims should be dismissed without a hearing. (Doc. 9 at 3). An evidentiary hearing is not required if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "A hearing is not required on patently frivolous claims or those which are based on unsupported generalizations. Nor is a hearing required where the petitioner's allegations are affirmatively contradicted by the record." *Holmes v. United States*, 876 F.2d 1545, 1553 (11th Cir. 1989).

### A. Ineffective Assistance of Counsel

The seminal case articulating the standard to evaluate the effectiveness of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court established a two-prong test to determine whether counsel provided effective assistance. The movant must show (1) his attorney's performance was deficient ("performance prong") and (2) the deficient performance prejudiced him ("prejudice prong"). When judging whether the attorney's performance was deficient, the movant must show that the attorney's

representation fell below an objective standard of reasonableness, while giving a strong presumption that counsel's conduct was appropriate.  As to the prejudice prong, the movant must show that the outcome of the proceeding would have been different but for the attorney's errors.  *Id.* at 687-96.

### 1. Failure to Suppress/Discredit Evidence – Pill Bottle (Label) in Name of Carla Pigg Recovered From Russell's Truck on January 20, 2009 and Presentation of 10 or 15 Partially-filled Pill Bottles in Court

Russell contends his attorney's performance was deficient because he did not object to or discredit certain testimony provided by Agent Tim Glover of the Lauderdale County Task Force.  (Doc. 2 at 6-7).  Specifically, Russell contends Agent Glover committed perjury when he testified that a pill bottle with Carla Pigg's name on it was found during the search of the truck Russell was driving on January, 20, 2009, and when he testified that 10-15 partially-filled bottles of pills presented at trial were found in Russell's home during the February 2, 2009, search.  (Doc. 2 at 6-7).  Russell states that, during the trial, he told his attorney about evidence that would show Agent Glover was lying, but that his attorney said "I can't do that" and instead his attorney asked Agent Glover if he might have gotten the evidence from the searches mixed up.  (Doc. 2 at 7).  According to Russell, Agent Glover testified that there was no way he could have mixed up the evidence because Russell's search was a state search and Oakley's search was

federal. (*Id.*).   Russell points to two pieces of evidence in support of his argument:

(1) a file memorandum drafted by Agent Glover regarding his investigation

outlining what was found during each search, (doc. 4 at 8-9), and (2) the complaint

in support of his arrest warrant with the evidence against Russell, (doc. 4 at 10).

Agent Glover's memo states, in pertinent part, as follows:

> On 2/2/2009, Agents of the Lauderdale County Drug Task Force executed a search warrant at [address].  This was the residence of ROBERT TAYLOR RUSSELL.  ROBERT TAYLOR RUSSELL was present and alone at the residence during the search.  During the execution of the search warrant agents located and seized an unlabeled pill bottle that contained what is believed to be Hydrocodone. . . .

> . . .

> As part of my investigation of ROBERT TAYLOR RUSSELL, I learned that ROBERT TAYLOR RUSSELL was stopped by Alabama State Trooper Scott Simpson on 10/13/2008, and was found to be in possession of 2 (two) pill bottles, both contained prescription controlled substances. 1 (one) of the pill bottles was labeled to Kenneth McDonald for Alprazolam but contained Soma and Hydrocodone.  The other pill bottle contained Morphine and was also labeled to Kenneth McDonald.

> On 1/20/2009, Alabama State Trooper Scott Simpson stopped ROBERT TAYLOR RUSSELL again and found him to be in possession of 2 (two) empty pill bottles that were in a name other than ROBERT TAYLOR RUSSELL.

> Armed with this information, I obtained a search warrant for the vehicle ROBERT TAYLOR RUSSELL was driving on 1/20/2009. This vehicle was impounded by Trooper Simpson and was stored at Cox Towing in Killen Alabama.  During the search of this vehicle, agents located empty pill bottles and prescription receipts in the name

Case 3:13-cv-08007-LSC-JHE   Document 18   Filed 02/09/16   Page 9 of 25

of Ernest Wilkerson, Robert Long, Anthony Hines and Kenneth McDonald.

> During the search of [address] on 2/2/2009, agents located numerous pill bottles labeled to ROBERT TAYLOR RUSSELL. The pill bottle that contained Hydrocodone had no label. I believe the Hydrocodone in this pill bottle belonged to someone other than ROBERT TAYLOR RUSSELL.

(Doc. 4 at 8-9). Russell also points to the complaint in support of his arrest warrant in Lauderdale County, which states, in part, "ROBERT TAYLOR RUSSELL DID ON 2/2/2009 POSSESS THE CONTROLLED SUBSTANCE HYDROCODONE IN A BOTTLE THAT DID NOT HAVE A LABEL." (Doc. 4 at 10). The complaint further states that Russell possessed controlled substances in the names of several other individuals, but none were Carla Pigg. (*Id.*). As to the prejudice prong, Russell argues if his counsel would have done a proper pretrial investigation and had this information, he could have shown Agent Glover was not telling the truth and this would have changed the outcome of the trial. (Doc. 2 at 7).

In response, the government contends that the evidence in question, (government exhibit #6, doc. 9-1), was a pill bottle label, not a pill bottle, and that there was nothing for counsel to object to because it was found as the result of a validly-executed search warrant of Russell's vehicle. (Doc. 9 at 4-5; *see* doc. 9-1 (the Carla Pigg pill bottle label exhibit)).

The record reveals that at trial, the government called Agent Glover to testify.  (CR, doc. 122 at 1).  He testified that in 2008, the task force executed a search warrant on Johnson and Fraley's residence and that some of the evidence recovered led to a larger, subsequent investigation.  (*Id.* at 3).  He further testified that, at some point during that larger investigation, he developed information on Russell, which led to a search on January 20, 2009, of the truck Russell drove, where authorities found items that supported his investigation during that search.  (*Id.*).   The government then introduced six exhibits, to which Agent Glover testified each was found in the January 20, 2009 search of the truck Russell was driving.   Specifically, they were: (1) an empty pill bottle labeled to Earnest Wilkerson for diazepam ten milligrams, 32 count, (*id.* at 4-5); (2) an empty bill bottle labeled to Robert Long for hydrocodone ten milligrams, 90 tablets, (*id.* at 5-6); (3) a pill bottle labeled to Robert Long for Aprazolam (Xanax), one milligram, 30 tables, (*id.* at 6-7); (4) paperwork, i.e., a copy of the label that is on the pill bottle in exhibit #3 that the pharmacy gives you when you receive a prescription, (*id.* at 8); (5) a pill bottled labeled to Kenneth McDonald for Alprazolam two milligrams, 90 count, (*id.* at 8-9); and (6) a pill bottle label in the name of Carla Pigg from Sunshine Drugs in Ocala, Florida, for Hydrocodone, ten milligrams, (*id.* at 9-10).

Q: Show you what's been marked as government's exhibit number six. Do you recognize that?

A: Yes, sir, I do.

Q:  How do you recognize it?

A: It is a label that it appeared to be torn off a pill bottle that was found inside Mr. Russell's truck.

Q: Did you take custody of it at that time?

A: Yes, sir, we did.

Q: Is it in the same or substantially same condition today as when you first became into possession of it?

A: Yes, sir.

(*Id.* at 9).  At this point, the government moved to admit exhibit #6, which the court admitted with no objection from defense counsel. (*Id.* at 9-10).

Q: Specifically, what is exhibit number six?

A: It is a pill bottle label from sunshine drugs in Ocala, Florida, in the name of Carla Pigg [] for hydrocodone, ten milligram.

(*Id.* at 10).

Russell argues that authorities did not find the Carla Pigg pill bottle label[4] during the January 20, 2009 truck search, providing Agent Glover's file memo and complaint in support of arrest warrant as evidence.  The government's exhibit list provided prior to trial lists descriptions for exhibits 1 through 5 and states "Search

---

[4] Russell argues the exhibit was a pill bottle but admits it makes no difference to his argument whether it was the labeled pill bottle or merely the label.  (Doc. 12 at 2-3).

Warrant – Russell truck." (CR, doc. 73 at 1-2). For exhibit 6, the list states "Carla Pigg – prescription label – Hydrocodone" but provides no indication where the government obtained this evidence. (*Id.* at 2).

Agent Glover testified that, after the search of Russell's residence on February 2, 2009, Agent Joe Hearn was responsible for compiling a list of the evidence seized. (CR, doc. 122 at 46-47). Agent Glover further testified that Agent Hearn did not determine or segregate what was found in the truck parked in the driveway versus what was found inside the residence. (*Id.* at 47). Instead, Agent Hearn listed "assorted paperwork" and did not specify whether it was found in the residence or the truck, but was all referred to as "Bobby Russell Residence Search Warrant." (*Id.* at 47-48).

Even assuming that Russell's counsel should have used the file memo and complaint to try to impeach Agent Glover's testimony, Russell has not demonstrated this would have changed the outcome of his trial. *See Strickland*, 466 U.S. at 687-96 (discussing the prejudice prong). At most, it appears this evidence would show that the Carla Pigg pill bottle label could have been found in the truck on February 2, 2009, or in Russell's residence that same day. At trial, the jury heard Agent Glover's testimony regarding the search of the truck and Russell's residence, testimony that Oakley had access to the truck and that the label could

have been his, as well as evidence regarding Oakley's March 30, 2009 interview where he identified his "customers" and the orders placed in their names, including "Carla Pigg – One order per month," (doc. 4 at 14), but where he denied placing this order.  In the same interview, Oakley stated that Russell continued to order drugs, but used his own "customers," who were primarily Whitney Keith Tate, Anthony Hines, and Ken McDonald.  (*Id.*).  There was also substantial evidence that the co-defendants shared information regarding customers.  Based on all of this, the jury found Russell guilty of one count of mail fraud.  Cross-examination of Agent Glover based on the two documents Russell offers would not have changed this outcome.

As to Russell's argument about the "10 or 15 partially-filled bottles of pills," he fails to demonstrate how this prejudiced him.  Accordingly, this claim is due to be denied.

### 2. Failure to Call Todd Johnson, Tim Crews, and Nick McFall as Witnesses for the Defense

Russell contends his attorney failed to call Todd Johnson, Tim Crews, and Nick McFall as witnesses for the defense.  (Doc. 2 at 8-9). The decision to call (or not to call) potential witnesses is a strategic trial decision left up to trial counsel, and one which is ordinarily insulated from scrutiny under *Strickland*. *See* 466 U.S. at 689-90.

Russell's claim fails because a reasonable attorney could have concluded that these potential witnesses could have done more harm than good to Russell's defense.[5]  Tim Crews and Nick McFall were defendants in the parallel case brought by the Lauderdale County District Attorney's Office. Both men had given statements to law enforcement admitting their involvement in the overarching scheme as to co-defendants Oakley and (Alfred Shawn) Johnson.  (Doc. 4 at 15 & 16).  Neither provided any information (one way or another) as to Russell.  (*Id.*). Had they been called to testify by the defense, any testimony as to Oakley or Johnson's criminal behavior would have been merely cumulative as both Oakley and Johnson pleaded guilty to the scheme and testified to their illegal behavior at trial.

As to Todd Johnson, Russell specifically contends that he would have testified that Alfred Shawn Johnson was already ordering pills online in 2004, three years before Alfred Shawn Johnson testified that Russell showed him how to do it in 2007.  (Doc. 12 at 4; doc. 4 at 12).  Russell contends that, on the day of trial, he showed his attorney Todd Johnson's statement to this effect, and his attorney said "if you's [sic] shown me this earlier I would have called him to be a witness." (Doc. 12 at 4).  Russell contends he told his counsel that he had already shown him

---

[5] The reasonableness of a strategy is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof.  *Provenzano v. Singletary*, 148 F.2d 1327, 1332 (11th Cir. 1998).

the statement in June 2011, at Morgan County Jail, but his counsel said he did not remember it. (*Id.*) Even assuming this exchange is true and Russell's counsel said these things, it is clear from Todd Johnson's statement he had a criminal record and may have been involved in the scheme, making him easily impeachable. (*See* doc. 4 at 12). More importantly, Todd Johnson's statement contradicts the trial testimony provided by government witnesses, (*see* CR, doc. 121 at 43), so a reasonable attorney could have concluded that calling Todd Johnson to the stand and having the jury conclude he was lying was not in the best interest of the defendant.[6] The decision not to call these witnesses was squarely within defense counsel's purview and was a reasonable option, hence there was no *Strickland* violation.

### 3 & 4.    Failure to Conduct a Thorough Investigation (Truck Title and Internet Service)

Russell claims his counsel was ineffective because he failed to conduct a thorough investigation; specifically, that counsel should have investigated whether or not the truck Russell was driving was titled in his name and whether or not he

---

[6] Indeed, Russell's trial counsel has submitted an affidavit in response to Russell's motion to vacate in which he states that he did not call these witnesses because he did not believe these witnesses would have been helpful to the defense. (Doc. 9-2). He states that, "[d]uring the course of my trial preparation, the Defendant gave me the names of potential defense witnesses. I learned during my investigation that most of them were cooperating co-defendants, or had potentially inculpatory information about the Defendant's involvement." (*Id.* at 1). He further explained that he determined that Nick McFall was hiding to avoid service, and Russell could not say with certainty what McFall would say other than not naming Russell when he was interviewed by police earlier in the investigation. (*Id.* at 2).

had internet service at the time of the crime.  (Doc. 2 at 10).  Russell's counsel

knew that the truck's title was not in Russell's name, but was in the name of Misty

Oakley (wife of co-defendant/co-conspirator Marcus Oakley).  This fact came out

at trial, when defense counsel used this information during the cross-examination

of Agent Tim Glover as to the search of the vehicle and its relationship to Russell.

(*See* CR doc. 122 at 111).  Furthermore, defense counsel questioned Agent Glover

on the fact that no computer or fax machine was found in Russell's home during

the search.  (*See* CR doc. 122 at 111-12).  Any further information regarding

whether Russell had internet service would have been cumulative.  Counsel's

performance was not deficient under *Strickland* in this regard.

### 5. Failure to Move to Exclude Government Exhibits 1 Through 36

Russell contends his counsel was ineffective for failing to move to exclude

government exhibits 1 through 36, because the exhibits had not been provided

before trial. (Doc. 2 at 11).  In support of his allegation that his attorney did not

know about these exhibits beforehand, Russell contends that his attorney told him a

month before trial that the government had no evidence at all against him and he

was going to get him an acquittal.  (Doc. 12 at 6).  Then, Russell further contends,

one week before trial he talked to his lawyer on the phone and he still said the

government had no evidence against him.  (*Id.*) As an initial matter, assuming

16

Russell's counsel made these statements, these statements are ambiguous as to whether they mean no evidence or insufficient evidence to convict Russell. Secondly, again assuming the statements are true, the statements are not inconsistent with the timeline showing that Russell's co-defendants, who provided a substantial portion of the evidence against Russell, entered plea agreements a week and two weeks before trial. (*See* CR, docs. 59 & 70).

In contrast to Russell's allegations, Russell's counsel has stated in his affidavit submitted in these proceedings that he "received timely discovery from the United States Attorney, and had ample time and opportunity to review and search the issues presented by the evidence." (Doc. 9-2 at 1). Ordinarily, a district court in a § 2255 proceeding may not decide a disputed factual issue by relying on the petitioner's defense counsel's affidavit over the petitioner's statement, and must instead decide those types of disputed factual issues by conducting an evidentiary hearing. *See Alvarez-Sanchez v. United States*, 350 F. App'x 421, 423 (11th Cir. 2009) (citing *Owens v. United States*, 551 F.2d 1053, 1054 (5th Cir. 1977)). However, an exception to this rule exists when other record evidence corroborates the defense counsel's statement. *See id.* (citing *id; see also Jordan v. Estelle*, 594 F.2d 144, 145-46 (5th Cir. 1979) (holding that the district court erred in denying a § 2254 petition because it had improperly resolved a disputed factual issue based

solely on an affidavit filed by the petitioner's attorney, and there was no record evidence that corroborated the attorney's affidavit); *Montgomery v. United States*, 469 F.2d 148, 150 (5th Cir. 1972) (holding that "contested fact[ual] issues in § 2255 cases must be decided on the basis of an evidentiary hearing, not affidavits"). Here, this Court need not and does not rely solely on defense counsel's affidavit because defense counsel's statement in his affidavit is supported by ample undisputed record evidence that he had indeed been provided with the exhibits in question prior to trial.

The record plainly contradicts Russell's allegations that his defense counsel was not provided with exhibits 1 through 36 prior to trial. First, the government filed its exhibit list prior to trial listing out descriptions of all of these exhibits. (CR, doc. 62 (exhibit list), doc. 73 (amended exhibit list)). Importantly, Russell's defense counsel then filed a motion in limine seeking to exclude certain evidence in which he acknowledged that he had received the government's exhibit list and acknowledged that the government would be presenting several items of physical evidence at trial. (Doc. 67.) Then, on the first day of trial, during a recess and outside the presence of the jury, the Court addressed both counsel for the government and counsel for Russell and asked them to go through all of the exhibits and attempt to agree on which ones could come in to avoid the necessity of having a

witness identify each one. (CR, doc. 121 at 62.) Counsel for the parties then did this during the recess. This exchange occurred before the exhibits in question were introduced to the jury, and it indicates defense counsel's knowledge of the exhibits. Russell cites several instances where his counsel asked what an exhibit was before it was presented to the jury. (*See, e.g.,* CR, doc. 122 at 21-22). However, all the transcript shows is that Russell's counsel did not know which documents were being presented in what order, certainly not that he had not seen them before. Additionally, Russell's counsel did, in fact, object to the admission of certain photographs taken at Russell's home during the search warrant on the grounds that they were not presented before trial. (Doc. 122 at 11). The Court overruled the objection, stating that though the photographs themselves were not provided, defense counsel was aware of the date, location, and results of the search, therefore the defendant was not prejudiced by not having the photographs earlier.

Accordingly, Russell's counsel's failure to make the objection was not deficient performance under *Strickland.*

### 6. Failure to Impeach/Discredit Testimony of Marcus Oakley and Agent Tim Glover

Russell contends his counsel was ineffective because he did not impeach or otherwise discredit testimony of government witnesses Marcus Oakley and Agent Tim Glover. (Doc. 2 at 12-13). Specifically, Russell argues his counsel should have

impeached Oakley's testimony that he did not order pills in Carla Pigg's name with Oakley's March 30, 2009 interview with Special Agent Kuykendall (U.S. Marshalls) where he identified his "customers" and the orders placed in their names and included "Carla Pigg – One order per month." (Doc. 2 at 12 (citing doc. 4 at 14)). Russell states that if the jury had been aware that Oakley admitted to ordering in Carla Pigg's name once a month, the jury would have determined that there was at least a reasonable doubt as to Russell's guilt.

At trial, Oakley testified under oath that he knew Carla Pigg, that she was a friend he had known much of his life, but further testified he did not order pills for Carla Pigg. (Doc. 121 at 39). While Agent Kuykendall's report said something different, a witness cannot be impeached by someone else's statement. Additionally, defense counsel did ask Oakley about his interview with Agent Kuykendall, asking if he answered his questions truthfully, to which he said he did. (Doc. 121 at 34.) Russell's counsel did not act unreasonably in failing to further pursue that line of inquiry.

Second, Russell argues that during the cross-examination of Agent Glover, defense counsel failed to point out that the pill bottle label with Carla Pigg's name on it was dated October 28, 2008, and Russell borrowed the truck on December 25, 2008. (Doc. 2 at 13). Russell contends that this would have shown that the label

was probably in the truck before he borrowed it. (*Id.*) However, the date "10/27/08" was readily apparent from the exhibit, (doc. 9-1), and thus known to the jury.

### 7. Failure to Challenge Conclusions in the Pre-Sentence Report

Russell contends his counsel was ineffective for failing to challenge certain conclusions in the pre-sentence report, specifically regarding the quantity of the orders and his leadership role. (Doc. 2 at 13). Defense counsel filed objections to the pre-sentence report on November 30, 2011, and raised both of these arguments. (CR, doc. 100). There is no *Strickland* violation here.

### B. Prosecutorial Misconduct/Denied Fair Trial

Russell's second claim is for prosecutorial misconduct and that he was denied a fair trial based on the presentation of false evidence and false testimony. (*See* doc. 2 at 14-18; doc. 12 at 8-9). Generally, a defendant must assert an available challenge to a sentence on direct appeal or be barred from raising the challenge in a § 2255 motion. *Green v. United States*, 880 F.2d 1299, 1305 (11th Cir. 1989), *cert. denied* 494 U.S. 1018 (1990). Of course, if the challenge was not available to the defendant at the time of the direct appeal, the defendant would not be procedurally barred from presenting the issue in a § 2255 proceeding, providing the issue is within the narrow range of issues reviewable under § 2255. *Id.* (citations omitted).

A movant can avoid this procedural bar only by showing both cause for the failure to raise the claim on direct appeal and actual prejudice arising from the failure. *Id.* (citing *Parks v. United States*, 832 F.2d 1244, 1245 (11th Cir. 1987)). Russell did not raise any claims for prosecutorial misconduct on direct appeal. *See United States v. Russell*, Case No. 11-15794 (11th Cir. 2012). Russell argues this failure was because he "only came into this evidence of prosecutorial misconduct after the trial so it is properly admitted in [his] motion 2255." (Doc. 12 at 9). This argument fails. For Russell's argument to work, the Court has to believe that he was unaware that the testimony and evidence presented against him at trial was false. Because the evidence at trial related to allegations against Russell, he would have known at the time the evidence was presented that it was false. Thus, this challenge was available to Russell on direct appeal, and he has presented nothing to excuse his default.

Furthermore, even if this claim were not procedurally defaulted, it is due to be denied. Even assuming government witnesses committing perjury in testifying against Russell, as Russell conclusorily claims, Russell presents no evidence that the government knew the testimony was false.[9] When dealing with the unwitting use of perjured testimony, most circuit courts employ the "probability standard"

---

[9] Russell has presented no evidence to suggest any of the testimony of the government witnesses was perjured.

and only grant relief when the discovery of the perjured testimony "probably" or "likely" would lead to acquittal. *United States v. Torres*, 128 F.3d 38, 29 (2d Cir. 1997), *United States v. Sinclair*, 109 F.3d 1527, 1528 (10th Cir. 1997), *United States v. Tierney*, 947 F.2d 854 860-61 (8th Cir. 1991), *United States v. Krasny*, 607 F.2d 840, 844-45 (9th Cir. 1979), *United States v. Huddleston*, 194 F.3d 214, 216 (1st Cir. 1999).

Although Russell conclusorily claims that "had the perjured testimony not been presented in court he would have been acquitted on all charges," (doc. 12 at 8), the trial consisted of voluminous testimony and physical evidence to prove his guilt. Co-conspirators took the stand and testified against Russell. Even if it had come out at trial that Oakley did buy pills for Carla Pigg, in contradiction to his sworn trial testimony, there is overwhelming evidence of Russell's guilt. The undersigned cannot conclude that it is more probable than not that Russell would be acquitted on retrial absent the claimed "false testimony."  As to the alleged discovery violations, those are addressed *supra* in the subsection on Russell's fifth claim of ineffective assistance of counsel.

### C. Actual Innocence

Finally, Russell claims his sentence should be vacated because he is actually innocent. (Doc. 2 at 18-20; doc. 12 at 9-11).  Actual innocence generally requires an

offer of new evidence not presented at trial that is so reliable that it supports that, even in light of all of the other evidence and circumstances in the case, no reasonable jury would have found the defendant guilty beyond a reasonable doubt. *See Schlup v. Delo*, 513 U.S. 298 (1995).  It may also occur where courts determine that the defendant's conduct, as shown by the evidence or admitted by the defendant, was actually non-criminal.  *See Bousley v. United States*, 523 U.S. 614 (1998).  To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial.  *Fortenberry v. Haley*, 297 1213, 1222 (11th Cir. 2002).

Russell claims that if Todd Johnson had testified, he would have been found not guilty and contends that is the same thing as actual innocence.  (Doc. 2 at 18-19, doc. 12 at 9-10).  Even assuming that Todd Johnson would have testified that Russell "did not do it," and that Oakley was guilty of mail fraud, this is insufficient. First, Oakley is guilty of mail fraud – he pleaded such.  Second, the defense "I did not do it" came out at trial through Russell's testimony.  Russell took the stand and denied each of the Government's accusations.  The jury simply did not believe him.  In light of the overwhelming evidence against Russell, it is not reasonable to believe that Johnson's testimony would have changed the result. Nothing in Russell's motion, briefs, or evidence raises any doubts as to the jury's decision.

## IV. Conclusion

Based on the foregoing, Russell's § 2255 motion is due to be denied and this action dismissed with prejudice.

Additionally, Rule 11(a) of the Rules Governing 2255 Proceedings requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted). This Court finds Russell's claims do not satisfy either standard. As such, a certificate of appealability will not be issued.

A separate order will be entered.

**DONE** AND **ORDERED** ON FEBRUARY 9, 2016.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704